# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. James B. Clark |
| v. | : | Mag. No. 17-3195 |
| AHARON LEV, | : | **CRIMINAL COMPLAINT** |
| a/k/a "Aaron Lev," | : | |
| a/k/a "Aron Lev," | : | **FILED UNDER SEAL** |
| a/k/a "David Gold," | : | |
| a/k/a "David Monroe" | : | |

I, Sean McCarthy, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

### SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Sean McCarthy, Special Agent
Federal Bureau of Investigation

Sworn to before me and
subscribed in my presence

November 6, 2017, at
Essex County, New Jersey

HONORABLE JAMES B. CLARK         _____
UNITES STATES MAGISTRATE JUDGE    Signature of Judicial Officer

## ATTACHMENT A
## Count One
### (Conspiracy to Commit Mail Fraud)

From in or about August 2014 through in or about May 2016, in Ocean County, in the District of New Jersey and elsewhere, defendant

AHARON LEV,
a/k/a "Aaron Lev,"
a/k/a "Aron Lev,"
a/k/a "David Gold,"
a/k/a "David Monroe,"

did knowingly and intentionally conspire and agree with Co-Conspirator 1 and with others to devise a scheme and artifice to defraud the Credit Card Company and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, did knowingly and intentionally cause to be delivered by mail and private and commercial carrier according to the direction thereon, among other things, credit cards issued by the Credit Card Company, as discussed in Attachment B, contrary to Title 18 United States Code, Section 1341.

In violation of Title 18, United States Code, Section 1349.

## Count Two
### (Mail Fraud)

From in or about August 2014 through in or about May 2016, in Ocean County, in the District of New Jersey and elsewhere, defendant

AHARON LEV,
a/k/a "Aaron Lev,"
a/k/a "Aron Lev,"
a/k/a "David Gold,"
a/k/a "David Monroe,"

did knowingly and intentionally devise a scheme and artifice to defraud the Credit Card Company and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice to defraud or attempting

to do so, cause to be delivered by mail and private and commercial carrier according to the direction thereon, among other things, credit cards issued by the Credit Card Company, as discussed in Attachment B.

In violation of Title 18, United States Code, Section 1341 and Section 2.

## ATTACHMENT B

I, Sean McCarthy, a Special Agent with the Federal Bureau of Investigation ("FBI"), having conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

## BACKGROUND

1. At various times relevant to this Complaint:

    a. Defendant AHARON LEV, a/k/a "Aaron Lev," a/k/a "Aron Lev," a/k/a "David Gold," a/k/a "David Monroe," resided in or around New Jersey, New York, and Israel.

    b. Co-Conspirator 1 resided in or around Utah and ran a business that, among other things, bought frequent flyer miles issued by airlines as rewards to their repeat customers ("Frequent Flyer Miles") from consumers and sold them to travel agencies and others.

    c. The "Credit Card Company" was headquartered in or around New York, New York.

    d. The Credit Card Company offered credit card services to customers, including small businesses.

    e. To apply for a small business credit card account with the Credit Card Company, an authorized representative of the business (the "Applicant") had to submit an application (the "Application").

    f. The Application had to include the Applicant's personally identifying information ("PII"), including their social security number and address, as well as information about the small business with which the Applicant was associated.

    g. In submitting the Application, the Applicant certified that he or

4

she was the small business's authorized representative and that the information provided on the application was accurate.

h. The Credit Card Company offered credit card holders certain rewards for spending money using the Credit Card Company's cards. These rewards included "points" (the "Rewards Points") which were provided by the Credit Card Company in proportion to customers' purchases with their credit cards. In the Terms and Conditions, the Credit Card Company informed its customers in sum and substance that returned purchases were not eligible for Rewards Points. In addition, the Credit Card Company did not award Rewards Points based on purchases that were later returned.

i. In addition, to acquire new customers, the Credit Card Company regularly issued promotional offers where it agreed to award new customers a substantial number of additional Rewards Points ("Promotional Rewards Points") for spending a certain amount of money in a specified period of time with their new credit card. Through in or about October 2015, the Credit Card Company informed its customers in sum and substance that returned purchases were not eligible for Promotional Rewards Points. Throughout the relevant time period, including after in or about October 2015, the Credit Card Company's terms and conditions for Rewards Points and Promotional Rewards Points stated that if customers "attempt[ed] to use or earn points in a fraudulent way," the Credit Card Company may, among other things, "take away all points." In addition, starting in or abound November 2015, where customers received Promotional Rewards Points based on purchases that they later canceled, the Credit Card Company retracted previously awarded Promotional Rewards Points and informed the customers that such Promotional Rewards Points were retracted based on the apparent effort to obtain Promotional Rewards Points in an inappropriate way.

j. Rewards Points could be exchanged for goods and services or for "Frequent Flyer Miles," which could then be used to buy airline tickets. When customers used their Rewards Points for their purchases, the vendor was compensated by the Credit Card Company, not the customer.

k. The Credit Card Company's terms and conditions for the Rewards Points program also stated: "Points are not your

property. You can't transfer points to any other person . . . ."

**OVERVIEW**

2.      From at least as early as in or about August 2014 through in or about May 2016, Defendant LEV, Co-Conspirator 1 and others (collectively, the "Co-Conspirators") engaged in a conspiracy to defraud the Credit Card Company by opening small business credit card accounts in the names of fake businesses (the "Fake Business Card Accounts"), using those Fake Business Card Accounts for purchases, obtaining Rewards Points based on those purchases, and transferring the Rewards Points to Frequent Flyer Miles accounts controlled by Co-Conspirator 1 and others.  In addition, while the Co-Conspirators obtained some Rewards Points and Promotional Rewards Points based on bona fide purchases that they made using the Fake Business Card Accounts, the majority of the Rewards Points and Promotional Rewards Points that the Co-Conspirators obtained were not based on bona fide purchases, but rather based on purchases that they made and then cancelled.

3.      The scheme and conspiracy included the following steps, among others:

- a. Step 1: the Co-Conspirators recruited individuals (the "Nominees") to provide their PII to the Co-Conspirators in exchange for a fee;
- b. Step 2: the Co-Conspirators created fake email addresses purportedly associated with the Nominees (the "Fake Email Addresses");
- c. Step 3: the Co-Conspirators applied for Fake Business Card Accounts using the Nominees' PII and the Fake Email Addresses;
- d. Step 4: after the Co-Conspirators caused the Credit Card Company to mail credit cards for the Fake Business Card Accounts to the Nominees in New Jersey and elsewhere, the Co-Conspirators obtained Fake Business Card Account numbers from the Nominees, and then made large purchases, for, among other things, air travel and car rentals, which they often later cancelled;
- e. Step 5: after the Rewards Points posted in the Fake Business Card Accounts, the Co-Conspirators transferred certain of the Rewards Points into Frequent Flyer Miles accounts that were accessed using internet protocol addresses associated with computers in Utah, where Co-Conspirator 1 resides;

6

    f. Step 6: the Co-Conspirators then closed the majority of the Fake Business Card Accounts, which usually avoided the need to pay any annual fees;

    g. Step 7: Co-Conspirator 1 and others used the Frequent Flyer Miles to purchase international air fare for paying customers; and

    h. Step 8: Co-Conspirator 1 compensated defendant LEV for the Rewards Points by wire transfer, ACH payments, cash, and other means.

4. It was further part of the conspiracy that defendant LEV and his Co-Conspirators opened more than 7,000 credit card accounts with the Credit Card Company, in the names of more than 1,500 different individuals and/or small businesses, to obtain more than 500 million Rewards Points.

5. Had the Credit Card Company known that the applications were being submitted by the same individuals over and over again, it would not have opened the credit card accounts.

## MANNER AND MEANS

6. It was part of the conspiracy for defendant LEV and others to recruit Nominees through local newspaper advertisements, email messages and otherwise by offering to pay the individuals for the use of their PII. For example, one advertisement stated: "What would you do with the EXTRA CASH . . . Top dollar paid for [Credit Card Company] Points 100K+ . . . You can earn up to $5000 in just one month! We will get you approved, arrange the spending and sell the points. Call for our special rates."

7. It was further part of the conspiracy for defendant Lev and others to pay the Nominees. These payments were made from bank accounts controlled by defendant Lev, Co-Conspirator 1, and others.

8. It was further part of the conspiracy that, after recruiting the Nominees, the Co-Conspirators used the Nominees' PII to create the Fake Business Card Accounts. Frequently, the Fake Business Card Accounts were applied for, and logged into, online through computers controlled by defendant LEV and others. In addition, the Co-Conspirators linked hundreds of the Fake Business Card Accounts with several bank accounts in the names of shell companies controlled by defendant LEV.

9. It was further part of the conspiracy that the Co-Conspirators took steps to conceal their identities as participants in the scheme. For instance, in or around October 2014, defendant LEV sent an email message to Co-

Conspirator 1 instructing: "My name should never be anywhere!"

10.  It was further part of the conspiracy that in communicating with the Credit Card Company about the Fake Credit Card Accounts, the Co-Conspirators took steps to conceal their identities from the Credit Card Company:

   a. For example, the Credit Card Company received a call purportedly from an Applicant, which came from a telephone number registered to defendant LEV. The caller spoke in a fake female voice, but several minutes into the call, when the Credit Card Company placed him on hold, the caller answered a separate telephone call and switched to a male voice.

   b. On at least five other occasions, the same telephone number – registered to defendant LEV – called the Credit Card Company purportedly as another Applicant. During approximately two of these calls, the caller provided information for a bank account controlled by defendant LEV.

11.  It was further part of the conspiracy for the Co-Conspirators to repeatedly make, and then cancel, purchases with the Fake Business Card Accounts to obtain Promotional Rewards Points without actually having made bona fide purchases. The Co-Conspirators communicated about this repeatedly. As just a couple of examples:

   a. In an email message sent to defendant LEV on or about December 24, 2015, Co-Conspirator 1 stated that, according to other "brokers that do manufacturing," the Credit Card Company had retracted Rewards Points and they all "blame fake spending." For that reason, Co-Conspirator 1 told defendant LEV to do "some" "real spend" on the Fake Business Card Accounts.

   b. Defendant LEV responded: "as long as we use points fast real spend is not issue."

   c. On or about March 21, 2016, when the Credit Card Company closed a Fake Business Account, Co-Conspirator 1 questioned defendant LEV about whether the Credit Card Company might have closed the Account because "looked at [the Applicant's] husbands [account] and saw fake spend??"

12.  It was further part of the conspiracy that defendant LEV and others concealed from the Nominees that the Fake Business Card Accounts would often be used to make and then cancel purchases. On or about

November 16, 2016, one Applicant sent an email to a Co-Conspirator, stating:

> if u would be doing things legit not rental reservations and then cancelling them u would not be having these issues and I didn't want cards opened and closed a month later witch [sic] affects my credit (which u need to do in order that the points are not confiscated ) I did not realize what I'm getting involved in . . . .

13. It was further part of the conspiracy that defendant LEV and the Co-Conspirators took other affirmative steps to conceal from the Credit Card Company that they controlled the Fake Business Card Accounts. For example:

   a. On or about June 12, 2015, one of the Co-Conspirators advised a Nominee that they submitted an application in the Nominee's name, and instructed the Nominee not to answer the telephone:

   > . . . please advise not to p/u [pick up] calls and disregard letters, however if he receives a call with a reference number and name to call back by let me know otherwise sit tight we are handling it.

   b. In another message, sent on or about August 19, 2015, a Co-Conspirator told another Nominee to "never ever talk to [the Credit Card Company]."

   c. On or about February 13, 2016, Co-Conspirator 1 instructed a Nominee: "Feel free to answer [if the Credit Card Company calls] and simply say you did the applications, any spend we may have done or points transfers were authorized, and if they ask for anything more beyond your basic info like social security number simply ask them to send the request in writing so you can review it with your accountant to get them what they need."

14. It was further part of the conspiracy for the Co-Conspirators to misrepresent to the Credit Card Company that the Applications were for actual small businesses and first-time Applicants (or Applicants who had not held the type of credit card account in the last 12 months), and that the charges on the Fake Business Card Accounts would be used for business purposes. These were materially false representations because, among other things, certain Rewards Points were available only to businesses or to first-time Applicants, or to Applicants who had not held the type of credit card account in the last 12 months.

15. It was further part of the conspiracy that the Co-Conspirators signed up for the Fake Business Card Accounts using email addresses whose domain names, such as gemail.biz, had been registered by defendant LEV. Defendant LEV registered those domain names using his personal telephone number, an address associated with a one of his shell companies, and several fake names, such as "David Gold" or "David Monroe."

16. It was further part of the conspiracy that defendant LEV and Co-Conspirator 1 maintained a list of Fake Business Card Accounts, which reflected login information for the accounts, the Nominees' PII, and the dates on which the Co-Conspirators expected the Rewards Points to post. It was further part of the conspiracy that the Co-Conspirators almost immediately accessed the Rewards Points when they became available and transferred them to Frequent Flyer Miles accounts that Co-Conspirator 1 and others controlled.

17. It was further part of the conspiracy that Co-Conspirator 1 paid defendant LEV for the fraudulently obtained Rewards Points, frequently through wire transfers or ACH. For example, on or about January 28 and January 29, 2016, Co-Conspirator 1 wired payments of approximately $10,000 and $20,000, respectively, from two companies controlled by Co-Conspirator 1 to a shell company controlled by defendant LEV. In email messages sent on or about January 28 and January 29, 2016, an associate of Co-Conspirator 1 emailed confirmation of the payments to Co-Conspirator 1 and defendant LEV. During the course of the conspiracy, Co-Conspirator 1 transferred approximately $3.5 million from bank accounts controlled by Co-Conspirator 1 to bank accounts controlled by defendant LEV.

18. It was further part of the conspiracy that the Co-Conspirators communicated by email about the amounts Co-Conspirator 1 owed to defendant LEV. For example, on or about May 16, 2016, Co-Conspirator 1 sent an email message stating that on or about that date defendant LEV was going to receive approximately 1.3 cents per point for approximately 456,000 points, for a total payment of approximately $5,928.

19. It was further part of the conspiracy that the Co-Conspirators caused the Credit Card Company to mail credit cards from its offices outside New Jersey to the various Nominees, including on or about March 31, 2016, when the Credit Card Company mailed a credit card to a Nominee's residence in New Jersey.